## THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

|  |  |
|---|---|
| THOMAS CONNLY, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>NASCAR ENTERPRISES, LLC,<br><br>Defendant. | Case No.:<br><br><br>**JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Thomas Connly, on behalf of himself and of all others similarly situated, by and through undersigned counsel, alleges, upon personal knowledge as to his own acts and experiences and, where indicated, upon information and good faith belief, against NASCAR Enterprises, LLC ("Defendant" or "NASCAR") the following:

### NATURE OF THE ACTION

1.      Plaintiff Thomas Connly brings this class action lawsuit on behalf of himself and a class of persons impacted by Defendant's failure to safeguard, monitor, maintain and protect highly sensitive personally identifiable information ("PII") including financial or insurance information of NASCAR current and former employees, customers and other individuals whose information was

provided to Defendant in connection with NASCAR events, fan memberships, ticket purchases, merchandise sales, and other NASCAR-related services.

2.      Defendant owns 14 major racing venues, oversees stock car racing in the United States, and runs three racing series, serving millions of racing fans and participants nationwide.

3.      Between March 31 and April 3, 2025, Defendant suffered a data breach when unauthorized actors gained access to its network systems in a ransomware attack (the "Data Breach").

4.      According to reports and regulatory filings, cybercriminals compromised PII of an unknown number of individuals whose information was maintained by Defendant in connection with NASCAR services and events.

5.      The PII compromised in the Data Breach included, but was not limited to, individuals' names and Social Security numbers. The Medusa ransomware group claimed responsibility for the attack, alleging the theft of approximately 1 terabyte of data and demanding a $4 million ransom.

6.      The type of highly sensitive information impacted by the Data Breach is particularly valuable to data thieves because it can be used to orchestrate a wide range of fraudulent activities, including financial fraud and identity theft.

7.      As a result of Defendant's actions and inactions, Plaintiff and Class Members have been forced to undertake time-consuming and costly efforts to

mitigate the actual and potential harm caused by the Data Breach's exposure of their PII, including placing freezes and alerts with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and monitoring their credit reports and accounts for unauthorized activity.

8.     Plaintiff and Class Members were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

9.     As such, Plaintiff and Class Members bring this action to recover for the harm they suffered and assert the following claims: (i) Negligence, (ii) Negligence *per se*, (iii) Invasion of Privacy, (iv) Breach of Implied Contract, (v) Unjust Enrichment, and (vi) Breach of Fiduciary Duty.

## Parties

10.     Plaintiff Thomas Connly is a natural person and citizen of Florida, residing in Palm Coast, Florida at all relevant times.

11.     Defendant NASCAR Enterprises, LLC is a Delaware corporation with its principal place of business at 1 Daytona Boulevard,  Daytona Beach, Florida, 32114.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in

which: (a) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (b) members of the proposed class are citizens of states different from Defendant; and (c) the number of proposed class members exceeds 100.

14.    This Court has personal jurisdiction over Defendant because it is incorporated in Florida, maintains its principal place of business in this District, and has sufficient minimum contacts with this District.

15.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendant maintains its principal place of business and conducts substantial business in this District.

## COMMON FACTUAL ALLEGATIONS

### A. Defendant Collected, Maintained and Stored PII.

16.    Defendant is the premier stock car racing organization in the United States, operating multiple racing series and venues across the country, employing thousands of individuals and contracting with numerous vendors, suppliers, and service providers.

17.    In the course of its business operations, Defendant requires employees, contractors, vendors, and service providers to submit extensive sensitive personal and financial information as a condition of employment or

doing business with NASCAR, including information necessary for payroll processing, tax reporting, background checks, vendor payments, and compliance with federal and state employment laws.

18.    Specifically, employees are required to provide their PII for employment purposes to NASCAR, including but not limited to their names, addresses, Social Security numbers, dates of birth, driver's license numbers, banking information for direct deposit, tax withholding information, health insurance enrollment data, emergency contact information, and employment authorization documentation. Similarly, NASCAR vendors and contractors must provide Tax Identification Numbers, banking information, corporate officer information, and other sensitive business and personal data.

19.    By collecting and storing this information, Defendant assumed a duty to securely maintain and protect the PII of individuals who had no choice but to provide this information as a mandatory condition of their employment or business relationship with NASCAR.

20.    The PII that Defendant maintains from employees and vendors is particularly sensitive and valuable, containing the complete identity profiles necessary for financial fraud, tax fraud, and synthetic identity theft, making NASCAR an attractive target for cybercriminals seeking to obtain and misuse or sell personal data.

21.    Defendant acknowledges through its privacy notices and communications its obligation to protect personal information and comply with applicable privacy laws and regulations, including those governing the protection of employee and vendor data.

22.    Plaintiff and Class Members, as current and former employees, vendors, and other individuals whose relationship with NASCAR required or induced them to provide PII to NASCAR, relied on Defendant to implement and maintain reasonable and adequate security measures to keep their PII secure and protected from unauthorized access, particularly given that providing such information was mandatory for their employment or business relationships.

**B.  Defendant's Data Breach Exposed PII.**

23.    Defendant derives a substantial economic benefit from its racing operations, which rely on thousands of employees and numerous vendor relationships, and as a necessary part of these employment and business relationships, Defendant requires, collects, and stores Plaintiff and Class Members' PII.

24.    By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII from disclosure.

25.     Defendant made promises to Plaintiff and Class Members to maintain and protect their PII, demonstrating an understanding of the importance of securing PII.

26.     Between March 31 and April 3, 2025, Defendant suffered a data breach when unauthorized actors gained access to its network systems in a ransomware attack and exfiltrated files containing individuals' PII.

27.     Upon information and good faith belief, the Data Breach was perpetrated by the Medusa ransomware group, which subsequently posted claims about the stolen data on its Tor-based leak site in April 2025, demanding a $4 million ransom for the return of _one terabyte_ of stolen information.[1]

28.     The incident was identified by Defendant on April 3, 2025, yet Defendant took several months to complete its investigation and begin notifying affected individuals, with notification letters being sent only on or around July 24, 2025.

29.     According to regulatory filings and breach notifications, NASCAR's "investigation determined that hackers had access to NASCAR's network between

---

[1] _NASCAR Confirms Spring Data Breach, Protective Response_, https://www.sportingnews.com/us/nascar/news/report-nascar-confirms-spring-data-breach-protective-response/c69156a7af07781ae5c4c24e (last visited July 31, 2025).

March 31 and April 3, 2025, and that they exfiltrated files containing personal information, including names and Social Security numbers."[2]

30.    In fact, it appears that the Data Breach is much larger and involves treasure troves of data including "detailed maps of raceway grounds, staff email addresses, names and job titles, as well as credential-related information, pointing to a genuine compromise of both operational and logistical data."[3]

31.    Due to the obfuscating nature of NASCAR's notice and lack of transparency about the Data Breach on Defendant's behalf, it is unclear how many individuals have been affected by the Data Breach. However, the data loss is almost certainly significant given the information released by Medusa, the group responsible for the hack, and the ransom demanded.

32.    Defendant's notification is legally inadequate as it does not provide specific information regarding what security measures have been implemented, nor does it provide comprehensive details about the full scope of information compromised.

---

[2] *NASCAR Confirms Personal Information Stolen in Ransomware Attack,* https://www.securityweek.com/nascar-confirms-personal-information-stolen-in-ransomware-attack/ (last visited July 31, 2025).

[3] *Report: NASCAR confirms spring data breach, protective response* (July 25, 2025), https://sports.yahoo.com/article/report-nascar-confirms-spring-data-003628547.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAADFlAde_Cgc_uD6UqOEGRT89i01RbgiZ8SeUzYe2EBo6Mm9HS1Mi8HuXrFNrwTT6oGf9XYl5KsW4pBXxsk1_zltK8vTlxDp6fJcWJq7O_MMkz8c3Z--B5kr2ScqVQrmCDm9NPdk1LGVhyRegdUYJtgfPCd0mkW-k_DsEdtrlry5J

33.     For example, Defendant's claims that it has taken "steps to enhance the security of our network environment" are insufficient to ensure that Plaintiff's and Class Members' PII will be protected from additional exposure in a subsequent data breach.

34.     Defendant could have prevented this Data Breach by properly securing and encrypting the files and systems containing the PII of Plaintiff and Class Members, and by implementing proper vulnerability management procedures.

35.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or properly monitoring for unauthorized access.

36.     As a result, criminal actors from a notorious ransomware gang Medusa accessed files containing unencrypted PII of Plaintiff and Class Members.

37.     NASCAR has not made any public statements on whether it made a ransom payment to Medusa related to the Data Breach.

38.     Thus, on information and belief, Plaintiff's and Class Members' PII has already been published, or will be published imminently, on the dark web.

39.     Moreover, even if NASCAR made a ransom payment, there is no guarantee that the data Medusa stole will be deleted. The stolen PII is valuable,

and can easily be sold to another threat actor, so there is little incentive to delete it. In fact, Medusa typically advertises the sale of the data it steals to anyone willing to pay concurrently with its ransom demands.

40.    In fact, FBI investigations identified that after paying the ransom, one victim was contacted by a separate Medusa affiliate referred to as "Medusa actors") who claimed the negotiator had stolen the ransom amount already paid and requested half of the payment be made again to provide the "true decryptor."[4] This indicates that the Medusa cybercriminals will not abide by Medusa's promises not to disclose an organization's data after a ransom payment has been made.

41.    Additionally, there have been cases where the links that lead to compromised files, while removed from the group who received the ransom payment's dark web website, remain available on the servers used by other hackers, even after the ransom demand is met.

42.    To date, upon information and good faith belief, NASCAR has not notified all Class Members about the theft of their PII by Medusa, leaving them vulnerable to identity theft and fraud.

---

[4] *#Stop Ransomware: Medusa Ransomware*, CISA (March 12, 2025), https://www.cisa.gov/news-events/cybersecurity-advisories/aa25-071a (advising that Medusa has expanded to an "affiliate model" where affiliates, referred to as "Medusa actors," use the group's software to attack organizations and take a cut of the resulting extortion payments).

43.     As a result of NASCAR's omissions, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach has been severely impaired.

**C.  Defendant Knew or Should Have Known of the Risk Because Institutions in Possession of PII Are Frequently Subject to Cyberattacks.**

35.     Given that Defendant was storing the PII of Plaintiff and Class Members and knew or should have known of the serious risk and harm caused by a data breach, Defendant was obligated to implement reasonable measures to prevent and detect cyber-attacks, such as those recommended by the Federal Trade Commission (the "FTC") and promoted by data security experts and other agencies.

36.     That obligation stems from the foreseeable risk of a data breach given that Defendant collected, stored, and had access to a wealth of highly sensitive personal records and data and, additionally, because other highly publicized data breaches put Defendant on notice that the personal and sensitive data it stores might be targeted by cybercriminals.

37.     Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation and United States Secret Service have issued warnings to potential targets, so they are aware of, and prepared for, a potential attack.

38.     Therefore, the increase in such attacks, and the attendant risk of future attacks, was widely known to the public and therefore to anyone in Defendant's industry, including Defendant.

39.     Despite the abundance and availability of information regarding cybersecurity best practices and the prevalence of data breaches, Defendant inexplicably failed to adopt sufficient data security processes by, without limitation:

> a. Failing to properly implement adequate access controls and monitoring systems;
>
> b. Failing to ensure the proper monitoring and logging of network traffic;
>
> c. Failing to ensure the proper monitoring and logging of file access and modifications;
>
> d. Failing to ensure the proper training of employees as to cybersecurity best practices;
>
> e. Failing to ensure fair, reasonable, or adequate computer systems and data security practices to safeguard the PII of Plaintiff and Class Members;
>
> f. Failure to timely and accurately disclose that Plaintiff's and Class Members' PII had been improperly acquired or accessed;
>
> g. Knowingly disregarding standard information security principles by allowing inadequate security measures;

h. Failing to provide adequate supervision and oversight of the PII with which they were entrusted.

40.    Upon information and belief, Defendant further failed to ensure the proper implementation of sufficient processes to quickly detect and respond to data security incidents, to ensure the proper encryption of Plaintiff's and Class Members' PII, and to monitor user behavior and activity to identify possible threats.

41.    Time is of the essence when PII is subject to unauthorized access and/or acquisition.

42.    The disclosed, accessed, and/or acquired PII of Plaintiff and Class Members is, upon information and good faith belief, already available on the Dark Web.

43.    Hackers can access and then offer for sale the unencrypted, unredacted PII to criminals.

44.    Plaintiff and Class Members are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from the publication of their PII onto the Dark Web.

45.    Plaintiff and Class Members now face a lifetime risk of identity theft, which is heightened here by unauthorized access, disclosure, and/or activity by cybercriminals on computer systems containing sensitive personal information.

46.     Despite the highly sensitive nature of the information that Defendant obtained, maintained, and stored and the prevalence of data breaches, Defendant inexplicably failed to take appropriate steps to safeguard the PII of Plaintiff and Class Members from being compromised.

47.     The Data Breach itself, and information Defendant has disclosed about the breach to date, including its scope, the need to remediate Defendant's cybersecurity, and the sensitive nature of the impacted data collectively demonstrate that Defendant failed to implement reasonable measures to prevent cyber-attacks and exposure of the PII it oversaw.

**D. NASCAR Failed to Comply with FTC Guidelines.**

48.     The FTC recognizes that consumer data is a lucrative (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[5]

---

[5] Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), https://www.ftc.gov/news-events/news/speeches/remarks-ftc-exploring-privacy-roundtable (last visited Aug. 6, 2025).

49.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

50.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for business.

51.    Those guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[6]

52.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods

---

[6]    *Protecting Personal Information: A Guide for Business* (2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Aug. 6, 2025).

for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[7]

53.    The FTC has also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business.

54.    According to the FTC, reasonable data security protocols require:

    a.    Encrypting the information stored on computer networks;

    b.    Retaining payment card information only as long as necessary;

    c.    Properly disposing of personal information that is no longer needed or can be disposed pursuant to relevant state and federal laws;

    d.    Limiting administrative access to business systems;

    e.    Using industry approved activity;

    f.    Monitoring activity on networks to uncover unapproved activity;

    g.    Verifying that privacy and security features function properly;

    h.    Testing for common vulnerabilities; and

    i.    Updating and patching third-party software.[8]

---

[7] *Start with Security: A Guide for Business* (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Aug. 6, 2025).

[8] *Id.*

55.    The FTC cautions businesses that failure to protect PII and the resulting data breaches can destroy consumers' finances, credit history, and reputations, and can take time, money, and patience to resolve the effect.[9] Indeed, the FTC treats the failure to implement reasonable and adequate data security measures-like Defendant failed to do here-as an unfair act prohibited by Section 5(a) of the FTC Act.

56.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act of practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.

57.    Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

58.    Defendant failed to properly implement basic data security practices.

59.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customer's PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[9] *See Taking Charge, What to Do if Your Identity is Stolen*, at 3 (Jan. 2012), https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last visited Aug. 6, 2025).

60.    Plaintiff alleges upon information and good faith belief, that Defendant was at all times fully aware of the obligation to protect the PII of their employees, vendors, and customers. Defendant was also aware of the significant repercussions that would result from their failure to do so.

**E.  NASCAR Failed to Comply with Industry Standards.**

61.    As shown above, experts studying cybersecurity routinely identify large companies like Defendant as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

62.    Several best practices have been identified that at a minimum should be implemented by companies like Defendant, including but not limited to educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limited which employees can access sensitive data.

63.    The United States Government and the United States Cybersecurity & Infrastructure Agency recommend several similar and supplemental measures to prevent and detect cyberattacks, including, but not limited to: implement an awareness and training program, enabling strong spam filters, scanning incoming and outgoing emails, configuring firewalls, automating anti-virus and anti-

malware programs, managing privileged accounts, configuring access controls, disabling remote desktop protocol, and updating and patching computers.

64.    Other best cybersecurity practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

65.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1[10] (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet's Critical Security Controls[11] (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

---

[10] Nat'l Inst. of Standards & Tech., *Framework for Improving Critical Infrastructure Cybersecurity*(2018), https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf (last visited Aug. 6, 2025).

[11] *See The 18 CIS Critical Security Controls*, https://www.cisecurity.org/controls/cis-controls-list (last visited Aug. 6, 2025).

66. The FBI's Internet Crime Complaint (IC3) 2019 estimated that there was more than $3.5 billion in losses to individual and business victims due to identity fraud in that year alone. That same report identified "rapid reporting" as a tool to help law enforcement stop fraudulent transactions and mitigate losses.

67. These foregoing frameworks are existing and applicable industry standards, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

**F. The Data Breach Resulted from NASCAR's Failure to Properly Maintain and Safeguard Their Systems and Data.**

68. Defendant breached its obligations to Plaintiff and Class Members and was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data.

69. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

   a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

   b. Failing to adequately protect employees', vendors', and customers' PII;

   c. Failing to properly monitor its own data security systems for existing intrusions;

   d. Failing to ensure that their vendors with access to their computer systems employed reasonable security procedures;

e.  Failing to detect unauthorized ingress into their systems;

f.  Failing to implement and monitor reasonable network segmentation to detect unauthorized travel within their systems, including to and from areas containing the most sensitive data;

g.  Failing to detect unauthorized exfiltration of the most sensitive data on their systems;

h.  Failing to train their employees in the proper handling of emails containing PII and maintain adequate email security practices;

i.  Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act; and

j.  Otherwise breaching their duties and obligations to protect Plaintiff's and Class Members' PII.

70.    Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII. Accordingly, as outlined below, Plaintiff and Class Members now face actual fraud and identity theft as well as increased risk of fraud and identity theft. In addition, Plaintiff and Class Members lost the benefit of the bargain they made with Defendant.

**G.  Cyberattacks and Data Breaches Cause Disruption and Put Victims at an Increased Risk of Fraud and Identity Theft.**

71.    Cyberattacks and data breaches at companies like Defendant's are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

72.     The United States Government Accountability Office released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[12]

73.     That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it.

74.     They do this by selling the spoils of their cyberattacks on the black market to identify thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate piece of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim.

75.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique called "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security Number. Social engineering is a form of hacking whereby a data thief uses

---

[12] See GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, at 2 (2007), https://www.gao.gov/new.items/d07737.pdf ("GAO Report") (last visited Aug. 6, 2025).

previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

76.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for 7 years if someone steal their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.13

77.    Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

78.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

---

[13] *See IdentityTheft.gov/Steps,* "https://www.identitytheft.gov/steps" (last visited Aug. 6, 2025).

79.    In addition, thieves may obtain a job using the victim's Social Security Number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an issued victim's name.

80.    Moreover, theft of PII is also gravely serious because PII is an extremely valuable property right.[14]

81.    Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.[15]

82.    There may additionally be a substantial time lag—measured in years—between when harm occurs and when it is discovered, and also between when PII and/or financial information is stolen and when it is used.

83.    According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

_____

[14] *See, e.g.,* John T. Soma *et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets,* 15 Rich J.L. & Tech. 11, at 3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets." (citations omitted).

[15] *Id.*

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[16]

84.    PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black- market" for years.

85.    There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

86.    Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

87.    PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of the information and damage to victims may continue for years.

88.    For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for

---

[16] *The GAO Report*, *supra*, note 12.

additional credit lines.17 Such fraud may go undetected until debt collection calls commence months, or even years, later.

89.     Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.

90.     Each of these fraudulent activities is difficult to detect.

91.     An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud.

92.     Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

93.     Moreover, it is not an easy task to change or cancel a stolen Social Security number.

94.     An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse.

95.     Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to

---

17 *Identity Theft and Your Social Security Number* (2021), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Aug. 6, 2025).

the old number, so all of that old bad information is quickly inherited into the new Social Security number."[18]

96.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at the cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[19]

97.    For this reason, Defendant knew or should have known about these dangers and strengthened its data systems and data security measures accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

**H. Plaintiff's and Class Members' Damages.**

98.    Upon information and good faith belief, Plaintiff and Class Members have been damaged by the compromise of their PII in the Data Breach.

---

[18] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back* (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identtiy-theft (last visited Aug. 6, 2025).

[19] Tim Greene, *Anthem hack: Personal Data stolen sells for 10x price of stolen credit card numbers* (Feb 6. 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Aug. 6, 2025).

99.    Plaintiff's and Class Members' PII was compromised in the Data Breach and is now in the hands of cybercriminals who accessed the data Defendant held within its systems. The PII exposed included the names, addresses, dates of birth, Social Security Numbers, financial account information, and other PII belonging to Defendant's current and former vendors and employees.

100.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

101.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach, valuable time Plaintiff and Class Members otherwise would have spent on other activities, including but not limited to work and/or recreation.

102.    Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. This risk is particularly acute for minor children whose pristine credit histories and unused Social Security numbers make them prime targets for synthetic identity theft that may go undetected for years or even decades.

103.    Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

104.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

105.    Plaintiff and Class Members also suffered a loss of value of their PII when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

106.    Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiff and Class Members who are current or former vendors, employees, or customers of Defendant's, or who otherwise submitted their data to Defendant, overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards.

107.    Part of the price Plaintiff and Class Members paid to Defendant was intended to be used by Defendant to fund adequate data security practices to safeguard Plaintiff's and Class Members' PII.

108.    As demonstrated by the Data Breach, Defendant failed to fund and provide adequate data security practices. Thus, Plaintiff and the Class Members

who are current or former employees, vendors, and customers of Defendant did not get what they paid for and agreed to.

109. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably spent to remedy or mitigate the effects of the Data Breach relating to:

    a. Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

    b. Purchasing credit monitoring and identity theft prevention;

    c. Placing "freezes" and "alerts" with reporting agencies;

    d. Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

    e. Contacting financial institutions and closing or modifying financial accounts; and,

    f. Closely reviewing and monitoring their medical insurance accounts, bank accounts, and credit reports, as well as alerts for identity fraud including their SSNs, for unauthorized activity for years to come.

110. Moreover, Plaintiff and Class Members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and

safeguards, including but not limited to, making sure that the storage of data or documents containing PII is not accessible online or otherwise to unauthorized third parties.

111.    Further, as a result of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their PII—which contains the most intimate details about a person's life–may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

112.    As a direct and proximate result of Defendant's actions and omissions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## REPRESENTATIVE PLAINTIFF'S EXPERIENCE

113.    Plaintiff Thomas Connly runs a company that has been working with NASCAR for the past several years, during which time he was required to provide extensive personal and financial information as a condition of his commercial relationship.

114.    As a condition of his commercial relationship with NASCAR, Plaintiff was required to provide sensitive personal and financial information to Defendant for payroll, tax, and employment purposes, including but not limited to, his name, address, Social Security number, date of birth, driver's license number, banking

information for direct deposit, tax withholding information, emergency contact information, and employment authorization documentation.

115.   Plaintiff provided this PII with the reasonable expectation that Defendant would protect and secure this information from unauthorized access and disclosure, particularly given that Defendant was legally obligated to safeguard employee records under federal and state employment laws.

116.   On or around July 24, 2025, Plaintiff received a notice from Defendant indicating that his PII was compromised in the Data Breach.

117.   Plaintiff reasonably expected and understood that Defendant would take, at a minimum, industry standard precautions to protect, maintain, and safeguard his PII from unauthorized users or disclosure, and would timely notify him of any data security incidents related to the same, as required by law for employee data breaches.

118.   Plaintiff had no choice but to provide his information to Defendant as it was mandatory for his contractual relationship with Defendant, and he relied on Defendant's representations and legal obligations regarding data security including keeping Plaintiff's PII safe.

119.   Plaintiff is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Furthermore, Plaintiff stores any documents containing

sensitive information in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for various online accounts.

120.    As a result of the Data Breach and at the recommendation of Defendant and its Notice, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial statements, monitoring credit information, and changing passwords on various accounts.

121.    Plaintiff has spent significant time responding to the Data Breach and will continue to spend valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation.

122.    Plaintiff suffered actual injury from having his sensitive information exposed and/or stolen as a result of the Data Breach including, but not limited to: (a) entrusting PII to Defendant that he would not have had Defendant disclosed it lacked data security practices adequate to safeguard its data; (b) damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant; (c) loss of privacy; (d) continuous imminent and impending injury arising from the increased risk of financial and identity fraud and theft; and (e) time and expense of mitigation efforts as a result of the Data Breach.

123.    Due to the Data Breach, Plaintiff anticipates spending considerable additional time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach, including monitoring accounts for fraudulent activity.

124.    Since the Data Breach, Plaintiff is particularly concerned about the long-term implications of having his Social Security number exposed, as this information cannot be changed and may be exploited for years to come.

125.    In addition, knowing that unauthorized actors accessed and/or stole his PII, including employment records, banking information, and tax data, which may be used for identity theft, financial fraud, tax fraud, and related purposes, has caused Plaintiff to experience feelings of anxiety, stress, and fear. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

126.    Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has experienced anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing and using his PII.

127.    Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties/criminals.

128.    Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

129.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure behalf of himself and all others similarly situated.

130.    The Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States whose PII was compromised in the Data Breach.

131.    The following people are excluded from the Class: (i) any judge or magistrate presiding over this action and members of their families; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant or its parent has a controlling interest, and its current or former officers and directors; (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

132.    Numerosity: The exact number of members of the Class is unknown but, upon information and belief, it is estimated to number in the tens or hundreds of thousands at this time, and individual joinder in this case is

impracticable. Members of the Class can be easily identified through Defendant's records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other data breach, consumer breach of contract, unlawful trade practices, and class action controversies.

133.   Typicality: Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff, and the members of the Class, sustained damages arising out of Defendant's Data Breach, wrongful conduct and misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and members of the Class sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

134.   Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiff has no interests that conflict with, or are antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff.

135.   Commonality and Predominance: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members

of the Class. Common questions for the Class include, but are not necessarily limited to the following:

a.  Whether Defendant violated the laws asserted herein, including statutory privacy laws;

b.  Whether Defendant had a duty to use reasonable care to safeguard Plaintiff's and Class Members' PII;

c.  Whether Defendant breached the duty to use reasonable care to safeguard Plaintiff's and Class Members' PII;

d.  Whether Defendant breached its contractual promises to safeguard Plaintiff's and Class Members' PII;

e.  Whether Defendant knew or should have known about the inadequacies of its data security policies and system and the dangers associated with storing PII;

f.  Whether Defendant failed to use reasonable care and commercially reasonable methods to safeguard and protect Plaintiff's and Class Members' PII from unauthorized release and disclosure;

g.  Whether the proper data security measures, policies, procedures, and protocols were in place and operational within Defendant's computer systems to safeguard and protect Plaintiff's and Class Members' PII from unauthorized release and disclosure;

h.  Whether Defendant took reasonable measures to determine the extent of the Data Breach after it was discovered;

i.  Whether Defendant's method of informing Plaintiff and other members of the Class was unreasonable;

j.  Whether Defendant's conduct was likely to deceive the public;

k.  Whether Defendant is liable for negligence or gross negligence;

l.  Whether Defendant's conduct, practices, statements, and representations about the Data Breach of the PII violated applicable state laws;

m. Whether Plaintiff and Class Members were injured as a proximate cause or result of the Data Breach;

n.  Whether Plaintiff and members of the Class were damaged as a proximate cause of the Data Breach;

o.  Whether Defendant's practices and representations related to the Data Breach  breached implied contracts with Plaintiff and members of the Class;

p.  What the proper measure of damages is; and

q.  Whether Plaintiff and members of the Class are entitled to restitutionary, injunctive, declaratory, or other relief.

136.  <u>Superiority</u>: This cause is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Class to obtain

effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

137.    A class action is superior to individual litigation because:

a. The amount of damages available to an individual plaintiff is insufficient to make litigation addressing Defendant's conduct economically feasible in the absence of the class action procedural device;

b. Individualized litigation would present a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system; and

c. The class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

138.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would

advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.  Whether Defendant failed to timely and adequately notify the public of the Data Breach;

    b.  Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

    c.  Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

    d.  Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

    e.  Whether Defendant failed to take commercially reasonable steps to safeguard PII in its possession; and

    f.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

139.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### NEGLIGENCE
### *(On Behalf of Plaintiff & the Class)*

140.    Plaintiff re-alleges and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

141.    Defendant required its employees, vendors, and customers, including Plaintiff and Class Members, to submit their PII to work as a vendor to Defendant, or otherwise interact with Defendant.

142.    By collecting and storing this data in its computer system and network, and sharing it and using it for commercial gain, Defendant owed a duty of care to use reasonable means to secure and safeguard its computer system — and Plaintiff's and Class Members' PII held within it — to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

143.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, the personnel

responsible for them, and its information technology partners adequately protected the PII.

144.    Plaintiff and the Class are a well-defined, foreseeable, and probable group of employees, vendors, and customers that Defendant was aware, or should have been aware, could be injured by inadequate data security measures.

145.    A large repository of highly valuable personal information is a foreseeable target for cybercriminals looking to steal and profit from that PII. Defendant knew or should have known that, given its repository of a host of PII for thousands of employees, vendors, and customers posed a significant risk of being targeted for a data breach. Thus, Defendant had a duty to reasonably safeguard Plaintiff's and Class Members' data by implementing reasonable data security measures to protect against data breaches. The foreseeable harm to Plaintiff and the Class of inadequate data security created a duty to act reasonably and safeguard the PII.

146.    After all, PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members. Thus, Defendant knew, or should have known, the importance of exercising reasonable care in handling the PII entrusted to them.

147.    Defendant's duty of care to use reasonable security measures also arose as a result of the special relationship that existed between Defendant and its

employees, vendors, and customers, which is recognized by laws and regulations, as well as common law. Defendant was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

148.    In addition, Defendant has a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.[20]

149.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

150.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' PII;

---

[20] *See* 15 U.S.C. §45.

b.  Failing to adequately monitor the security of its networks and systems;

c.  Failing to have in place mitigation policies and procedures;

d.  Allowing unauthorized access to Plaintiff's and Class Members' PII;

e.  Failing to detect in a timely manner that Plaintiff's and Class Members' PII had been compromised; and

f.  Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

151.   Defendant breached its duty to exercise reasonable care in safeguarding and protecting Plaintiff's and the Class Members' PII by failing to adopt, implement, and maintain adequate security measures to safeguard that information, despite the known risk of data breaches, and allowing unauthorized access to Plaintiff's and Class Members' PII.

152.   The failure of Defendant to comply with industry standards and federal regulations evidences Defendant's negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII.

153.   But for Defendant's wrongful and negligent breach of its duties to Plaintiff and Class Members, their PII would not have been compromised, stolen, and viewed by unauthorized persons. Defendant's negligence was a direct and

legal cause of the theft of the PII of Plaintiff and Class Members and all resulting damages.

154.    It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiff's and Class Members' PII would result in injury to Plaintiff and Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

155.    It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' PII would result in one or more types of injuries to Plaintiff and Class Members.

156.    As a result of this misconduct by Defendant, the PII of Plaintiff and Class Members was compromised, placing them at a greater risk of identity theft and of their PII being disclosed to third parties without the consent of Plaintiff and the Class.

157.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

158.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to Plaintiff and all Class Members.

## SECOND CAUSE OF ACTION
### NEGLIGENCE *PER SE*
### *(On Behalf of Plaintiff & the Class)*

159.    Plaintiff re-alleges and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

160.    Plaintiff alleges this negligence *per se* theory as alternative to Count I.

161.    Pursuant to the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, Defendant has a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII. Specifically, this statute prohibits "unfair . . . practices in or affecting commerce," including (as interpreted and enforced by the FTC) the unfair practice of failing to use reasonable measures to protect confidential data.[21]

162.    Moreover, Plaintiff and Class Members' injuries are precisely the type of injuries that the FTCA guards against. After all, the FTC has pursued numerous enforcement actions against businesses that—because of its failure to employ reasonable data security measures and avoid unfair and deceptive practices— caused the very same injuries that Defendant inflicted upon Plaintiff and Class Members.

---

[21] 15 U.S.C. §45

163.    Defendant's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect PII.

164.    Defendant owed Plaintiff and Class Members a duty to notify them within a reasonable time frame of any breach to their PII. Defendant also owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. This duty is necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps in an effort to mitigate the fallout of Defendant's Data Breach.

165.    Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from its inadequate security protocols. After all, Defendant actively sought and obtained the PII of Plaintiff and Class Members.

166.    Defendant breached its duties to Plaintiff and Class Members under the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII. And but for Defendant's negligence, Plaintiff and Class Members would

not have been injured. The specific negligent acts and omissions committed by Defendant include, but are not limited to:

    a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' PII:

    b. Failing to comply with—and thus violating—FTCA and its regulations;

    c. Failing to adequately monitor the security of its networks and systems;

    d. Failing to have in place mitigation policies and procedures;

    e. Allowing unauthorized access to Plaintiff's and Class Members' PII;

    f. Failing to detect in a timely manner that Plaintiff's and Class Members' PII had been compromised; and

    g. Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

167. Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

168. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

169.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their PII.

170.    Simply put, Defendant's negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injuries-in-fact and damages. These injuries include, but are not limited to, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence. Moreover, injuries-in-fact and damages are ongoing, imminent, and immediate.

171.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

172.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring

procedures; and (iii) continue to provide adequate credit monitoring to Plaintiff and all Class Members.

## THIRD CAUSE OF ACTION
### INVASION OF PRIVACY
### *(On Behalf of Plaintiff & the Class)*

173.    Plaintiff re-alleges and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

174.    Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

175.    Defendant owed a duty to its employees, vendors, and customers, including Plaintiff and the Class, to keep this information confidential.

176.    The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class Members' PII is highly offensive to a reasonable person.

177.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential information to Defendant as part of their employment, vendor relationship, or other relationship, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such

information would be kept private and would not be disclosed without their authorization.

178.    The Data Breach constitutes an intentional interference with Plaintiff's and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

179.    Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

180.    Defendant acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

181.    Acting with knowledge, Defendant had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

182.    As a proximate result of Defendant's acts and omissions, the PII of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

183.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury

to Plaintiff and the Class because their PII are still maintained by Defendant with their inadequate cybersecurity system and policies.

184.    Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiff and the Class.

185.    In addition to injunctive relief, Plaintiff, on behalf of himself and the other members of the Class, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

### FOURTH CAUSE OF ACTION
#### BREACH OF IMPLIED CONTRACT
#### *(On Behalf of Plaintiff & the Class)*

186.    Plaintiff re-alleges and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

187.    Defendant required Plaintiff and Class Members to provide and entrust their PII as a condition of obtaining services from Defendant and/or obtaining employment with Defendant.

188.    Plaintiff and Class Members paid money to Defendant, directly and/or indirectly, in exchange for goods and/or services as well as Defendant's promise to protect their PII from unauthorized disclosure.

189.    Defendant promised to comply with legal and industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

190.    Implicit in the agreement between Defendant and Plaintiff and Class Members was the obligation that both parties would maintain the PII confidentially and securely.

191.    Defendant had implied duties of good faith to ensure that the PII of Plaintiff and Class Members in their possession was used only as authorized.

192.    Defendant had implied duties to protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses.

193.    Additionally, Defendant implicitly promised to retain this PII only under conditions that kept such information secure and confidential.

194.    Through their course of conduct, Defendant, Plaintiff and Class Members entered into implied contracts for Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' PII.

195.    Defendant solicited and invited Plaintiff and Class Members to provide their PII as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

196.    Plaintiff and Class Members fully performed their obligations under the implied contract with Defendant. Defendant did not. Plaintiff and Class Members would not have provided their confidential PII to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their PII for uses other than obtaining benefits and services from Defendant.

197.    Defendant breached the implied contracts with Plaintiff and Class Members by failing to safeguard and protect Plaintiff's and Class Members' PII; failing to provide timely and accurate notice to Plaintiff and Class Members that their PII was compromised as a result of the Data Breach; and violating industry standards as well as legal obligations that are necessarily incorporated into implied contracts between Plaintiff, Class Members, and Defendant.

198.    Defendant's failures to meet these promises constitute breaches of the implied contracts.

199.    Furthermore, the failure to meet its confidentiality and privacy obligations resulted in Defendant providing goods and services to Plaintiff and Class Members that were of a diminished value.

200.   Defendant's acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiff and Class Members to provide their PII in exchange for services and employment benefits.

201.   As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and Class Members have suffered (and will continue to suffer) (a) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (b) actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (c) loss of the confidentiality of the stolen confidential data; (d) the possibility of an illegal sale of the compromised data on the dark web; (e) lost work time; and (f) other economic and non- economic harm.

202.   As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

### FIFTH CAUSE OF ACTION
#### UNJUST ENRICHMENT
#### *(On Behalf of Plaintiff & the Class)*

203.   Plaintiff re-alleges and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

204.   This claim is pleaded solely in the alternative to Plaintiff's breach of implied contract claim.

205.   Plaintiff and Class Members conferred a monetary benefit on Defendant by working for or providing services for Defendant. A portion of the proceeds of this benefit was intended to have been used by Defendant for data security measures to secure Plaintiff and Class Members' PII. Plaintiff and Class Members further conferred a benefit on Defendant by entrusting their PII to Defendant from which Defendant derived profits.

206.   Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide adequate security.

207.   Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

208.    Defendant acquired the monetary benefit and PII through inequitable means in that Defendant failed to disclose the inadequate security practices, as described herein, and failed to maintain adequate data security.

209.    If Plaintiff and Class Members knew that Defendant had not secured their PII, they would not have agreed to give their money—or disclosed their data— to Defendant.

210.    Plaintiff and Class Members have no adequate remedy at law.

211.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered—and will continue to suffer—a host of injuries, including but not limited to: (1) actual identity theft; (2) the loss of the opportunity to determine how their PII is used; (3) the compromise, publication, and/or theft of their PII; (4) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (5) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (6) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in their possession; and (7) future expenditures of time,

effort, and money that will be spent trying to prevent, detect, contest, and repair the impact of Defendant's Data Breach.

212.   The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and data security practices alleged in this Complaint.

213.   Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds it received as a result of its conduct and the Data Breach alleged herein.

**SIXTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
***(On Behalf of Plaintiff & the Class)***

214.   Plaintiff re-alleges and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

215.   In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became guardians of Plaintiff's and Class Members' PII, Defendant became fiduciaries by their undertaking and guardianship of the PII, to act primarily for Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' PII; (2) to timely notify Plaintiff

and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and do store.

216.  Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their relationship with their current and former employees, vendors, and customers to keep secure their PII.

217.  Defendant breached their fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give detailed notice of the Data Breach to Plaintiff and the Class in a reasonable and practicable period of time.

218.  Defendant breached their fiduciary duties to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' PII.

219.  Defendant breached their fiduciary duties owed to Plaintiff and Class Members by failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

220.  Defendant breached their fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' PII.

221.  As a direct and proximate result of Defendant's breaches of their fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise,

publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of Defendant's services they received.

222.    As a direct and proximate result of Defendant's breach of their fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Thomas Connly, on behalf of himself and all persons similarly situated, prays for judgment in his favor and against

Defendant NASCAR Enterprises, LLC, and respectfully requests that this Honorable Court enter an order:

A.  certifying this action as a Class action and appointing Plaintiff as Class Representative and his counsel as Class Counsel;

B.  granting equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.  granting equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII compromised during the Data Breach;

D.  granting equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.  requiring Defendant to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

F.  awarding actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.  awarding punitive damages, as allowable by law;

H.  awarding attorneys' fees and costs under the common fund doctrine, and any other applicable law;

I.  awarding costs and any other expense, including expert witness fees, incurred by Plaintiff in connection with this action;

J.    awarding pre- and post-judgment interest on any amounts awarded; and

K.    all such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: August 13, 2025                    Respectfully submitted,


                                          */s/ Matthew Langley*
                                          Matthew Langley (FL State Bar No. 97331)
                                          **ALMEIDA LAW GROUP LLC**
                                          849 W. Webster Ave.
                                          Chicago, Illinois, 60614
                                          Tel.: (708) 437-6476
                                          matt@almeidalawgroup.com


                                          *Attorney for Plaintiff & the Class*